UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 17-cr-1908-BEN |
| Plaintiff, | **ORDER DENYING DEFENDANT'S MOTIONS TO SEVER AND SUPPRESS EVIDENCE** |
| v. | |
| RICKY ORLANDO COTTON III, | |
| Defendant. | |

Defendant Ricky Orlando Cotton III moves to suppress evidence obtained during two separate incidents: (1) the government's April 12, 2017, search of a house on 32nd Street and (2) the government's June 15, 2017, detention of Defendant at the Crown Inn Motel parking lot. In a separate motion, Defendant moves to sever the two counts against him of felon in possession of a firearm. The government opposes both motions. On September 6, 2018, the Court held an evidentiary hearing. For the reasons set forth below, Defendant's motions are denied.

## I.     Background

On October 5, 2016, the California Superior Court sentenced Defendant Ricky Orlando Cotton III to three years of probation following his conviction for petty theft. Exhibit B, Dkt. 20-2. Defendant's probation terms included a Fourth Amendment Waiver, which required Defendant to "[s]ubmit person, vehicle, place of residence,

1

property, personal effects to search at any time with or without a warrant, and with or without reasonable cause, when required by a . . . law enforcement officer." *Id.* at p. 6.

On April 8, 2017, Detective J. Barrera of the San Diego Police Department ("SDPD") found a Snapchat video posted by an individual he believed to be Defendant. The posting username for the video was "rickycottoniii." The video, believed to have been posted on April 7, 2017, depicted Defendant in what appeared to be a bedroom holding two handguns and displaying gang signs. Detective Barrera identified the two black handguns in the video as likely a Beretta and a Glock with an extended magazine.

Detective Barrera reviewed Defendant's criminal records and discovered Defendant was a convicted felon,[1] was on active summary probation for the 2016 petty theft charge, and had a valid Fourth Waiver. Based upon this information and the Snapchat video, Detective Barrera began investigating Defendant for the crime of being a felon in possession of a firearm. A records check revealed Defendant provided his address to law enforcement as 423 32nd Street San Diego, California on nine separate occasions since September 2010 with the latest confirmation on February 18, 2017.

On April 12, 2017, Detective Barrera went to the 32nd Street address to conduct surveillance and a search. He observed Defendant and another man enter the residence and leave about 15 minutes later. At Detective Barrera's direction, law enforcement searched the residence and found a Glock pistol with an extended magazine in the rear bedroom, .9 mm ammunition, Defendant's wallet, and mail addressed to Defendant.

Among other crimes, Defendant was charged in California Superior Court for being a felon in possession of a firearm, and was released on bail. After Defendant failed to appear for his June 1, 2017 hearing, the Superior Court judge issued an arrest warrant.

In a separate incident, on June 15, 2017, Special Agent M. Crawford of the Drug Enforcement Administration ("DEA") conducted a buy-bust operation of a suspected

---

[1] Specifically, Defendant was convicted for a violation of California Penal Code Section 245(a)(1) – Assault with a Deadly Weapon, a felony.

drug dealer, Brian Rojas. That afternoon, Agent Crawford and his team pulled into a parking lot near 9610 Campo Road in Spring Valley, California. After Agent Crawford parked his car in the lot to conduct surveillance, he noticed an individual, later identified as Defendant, exit a black Saturn sedan and walk past his vehicle. The sedan, driven by a woman later identified as Deseray Germany, was parked by itself at the end of the fairly empty part of the parking lot. Defendant then walked by Agent Crawford's car and motioned his hands as if asking for a light. In response, Agent Crawford shook his head, and Defendant continued walking. Agent Crawford radioed to the rest of the team, including members of the SDPD, about Defendant's interaction asking for a light, that Defendant appeared to be looking into cars in the lot, and that agents should monitor Defendant because he appeared to be armed due to his hand placement around his waist.

SDPD Agents De Armas, Hedquist, and Olges were also present for the operation and heard the radio traffic from Agent Crawford about Defendant. When Defendant walked into Agent De Armas's line of sight, Agent De Armas similarly observed Defendant holding his hand under his shirt near his waistband, seemingly holding something heavy to prevent it from falling out of his pants. In Agent De Armas's experience and training, Defendant's hand placement was of the type used by individuals to conceal a firearm. Agent De Armas then observed Defendant and Rojas have a brief conversation, after which Rojas went back into the motel.

Shortly after, Rojas came back out of the motel carrying a backpack. He again conversed with Defendant. Immediately thereafter, Rojas walked across the street. Defendant also walked across the street just a few feet behind Rojas, seemingly in tandem. At that point, Agent De Armas believed Defendant and Rojas were together because of their interactions and the fact that they walked across the street at the same time immediately after talking with one another. In addition, based on Agent De Armas's experience with drug dealers who are often armed or will have someone with them as security for their operation, Agent De Armas suspected Defendant was carrying a firearm

and serving as security for the drug deal. Specifically, Detective De Armas thought Defendant's behavior could be a kind of counter-surveillance for the drug operation.

Around the point Rojas walked across the street, Agent Crawford and others moved to arrest Rojas. Based on the agents' belief that Defendant was either a co-conspirator in the drug operation or a security element, they decided to detain Defendant at the same time. The case agent put out on the radio to stop the black Saturn, which appeared to be leaving the parking lot and driving toward Agents De Armas and Olges who were still in their vehicle. Agent Olges positioned his vehicle in an attempt to block the Saturn from leaving. When Germany drove the Saturn around the agents' vehicle, instead, the agents yelled to the Saturn to stop, and it stopped. Detective De Armas then approached the Saturn's passenger side with his gun drawn, saw Defendant seated in the passenger seat, and ordered Defendant to show his hands.

Defendant initially complied with Agent De Armas's order but then put his hands back down and started to reach for something between his legs. Detective De Armas repeated his order to Defendant to show his hands. Defendant obeyed by showing his hands but again put them back down to reach toward the car's floorboards. At some point, concerned Defendant was reaching for a firearm, Detective De Armas grabbed Defendant's arm while still holding his gun in his other hand, and Agent Olges helped remove Defendant from the vehicle and handcuff him. Around the same time, Agent Hedquist removed Germany from the vehicle, pushed her to the ground, and handcuffed her. Agent Hedquist chose to handcuff Germany because of the radio traffic and belief that her vehicle's passenger, Defendant, was involved in the drug operation and armed.

After handcuffing Defendant and Germany and moving them away from the Saturn, DEA agents searched the Saturn and found a Beretta .40 caliber handgun, containing six rounds of .40 ammunition, under the front passenger seat where Defendant previously sat. Agents then arrested Defendant after determining he had a stolen gun in his possession and a warrant out for his arrest. Later, Rojas confessed to the buy-bust drug crime and exonerated Defendant of any involvement in the offense.

17-cr-1908-BEN

On July 12, 2017, an Indictment charged Defendant with two counts of Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(d)(1). Dkt. No. 1. In relevant part, Count I of the Indictment charged:

> On or about April 12, 2017, within the Southern District of California, defendant RICKY ORLANDO COTTON III, having been previously convicted by a crime punishable by imprisonment for a term exceeding one year, did knowingly possess a firearm that traveled in and affected interstate commerce, to wit: a Glock .45 caliber handgun with an obliterated serial number[.]

Count II charged:

> On or about June 15, 2017, within the Southern District of California, defendant RICKY ORLANDO COTTON III, having been previously convicted of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess a firearm that traveled in and affected interstate commerce, to wit: a Berretta .40 caliber handgun[.]

On July 18, 2017, Defendant pled not guilty to the two-count Indictment in the Southern District of California. Defendant then filed the present motions to sever and suppress.

## II. Motion to Sever

Defendant argues severance of Count I and II is required for two independent reasons. First, joinder is improper under Fed. R. Crim. P. 8(a) because there is not a sufficient connection between the two counts. Second, joinder is prejudicial under Rule 14 because it "may convince the jury of [Defendant]'s supposed propensity to illegally possess firearms." Dkt. 22-1 at p. 2. Defendant's arguments lack merit.

## A. Joinder Under Rule 8(a)

Rule 8(a) permits joinder of offenses against a single defendant in the indictment if any one of three conditions is satisfied, including if the offenses charged are "of the same or similar character." *United States v. Jawara*, 474 F.3d 565, 572 (9th Cir. 2007) (citing Rule 8(a)). This analysis is limited to information found on the Indictment's face. *Id.*

The Court finds Count I and II are "of the same or similar character," and thus, properly joined. Fed. R. Crim. P. 8(a)(1). The Ninth Circuit's rationale in *United States*

*v. Rousseau*, 257 F.3d 925, 932 (9th Cir. 2001), is directly on point.  As in the instant case, in *Rousseau*, the defendant was charged with two counts of felon in possession of a firearm.  The two counts in *Rousseau* took place at temporally different times, approximately seven months apart, and the counts involved two different types of firearms.  *Id.* at 928-29.  The Ninth Circuit affirmed the district court's denial of the defendant's motion to sever the two counts, aptly explaining, "Clearly these two offenses were of a same or similar character and therefore were joined properly."  *Id.* at 932.

Like *Rousseau*, Defendant is charged with two counts of felon in possession of a firearm.  Accordingly, the two offenses are properly joined because they are of a same or similar character.  *See id.*  Defendant disagrees, relying solely on *Jawara*, 474 F.3d 565.  In *Jawara*, the Ninth Circuit analyzed the joinder of two charges in the immigration law context: (1) document fraud related to the defendant's personal asylum application and (2) conspiracy to commit marriage fraud to avoid immigration laws.  In analyzing whether the counts were properly joined, the Ninth Circuit characterized the "same or similar character" test as "the most amorphous and controversial of the three grounds for joinder" and "[t]he more difficult question" because the two counts both related to immigration fraud.  The court went on to note its history of affirming joinder under this prong only "in a handful of decisions," including by favorably citing *Rousseau*.  The court then identified factors to consider in evaluating proper joinder under the "same or similar character" prong: (1) the elements of the statutory offenses; (2) the acts' temporal proximity; (3) the likelihood and extent of evidentiary overlap; (4) the acts' physical location; (5) the crimes' modus operandi; and (6) the victim's identities.  *Id.* at 578.

Applying those factors, the court held the two counts in *Jawara* were *not* of the "same or similar character" because the "vague thematic connection" that both counts involved immigration was not enough.  Specifically, the court reasoned the two counts involved two different statutory violations, requiring proof of different elements; they were separated by a significant time gap of three-and-a-half years; they involved different witnesses and evidence; and they involved different locations and unrelated victims.

In sharp contrast to the counts in *Jawara*, however, the counts at issue here have more than a vague thematic connection; indeed, the two counts are for the exact same offense. Although the two counts are properly joined under *Rousseau*, the Court nonetheless evaluates the two counts under the factors outlined in *Jawara* and concludes they are likewise properly joined under that test. As to the first factor, the elements of the two offenses are exactly the same because they involve the exact same offense, weighing heavily in favor of proper joinder. Second, unlike *Jawara* where the offenses lacked temporal proximity because they occurred three-and-a-half years apart, the offenses here occurred only two months apart. Although the acts did not take place at the same time, their temporal proximity is not so great as to weigh against proper joinder. Third, there are no similar witnesses, weighing slightly against proper joinder. However, an evidentiary overlap exists because both counts will require expert testimony regarding the defendant's criminal history and the firearms, weighing slightly in favor of proper joinder. Fourth, the two acts (possession of firearms) both occurred in the same region of the country, the Southern District of California. Fifth, because the *actus reus* and *mens rea* for both counts are identical, the modus operandi factor likely weighs in favor of proper joinder. Finally, the sixth factor (identity of victims) does not apply because the two charges did not involve victims. Weighing these factors, the Court finds that, on balance, the two counts are of the "same or similar character" and thus, properly joined under Rule 8(a).

**B.    Prejudice Under Rule 14**

Defendant next contends that regardless of whether joinder is proper under Rule 8(a), joinder is still improper under Rule 14(a) because a joint trial will prejudice him. In relevant part, Rule 14(a) provides that if the joinder of offenses "appears to prejudice a defendant . . . the court may order separate trials of counts" or "sever the defendants' trials, or provide any other relief that justice requires."

Accordingly, Rule 14 is a permissive rule, providing that, if joinder *appears* to prejudice a defendant, the court *may* take action, including by ordering separate trials of

17-cr-1908-BEN

the counts. Three situations exist in which properly joined counts could result in manifest prejudice sufficient to warrant severance:

(1) Where "the jury may consider that the defendant must be bad to have been charged with so many things";
(2) Where "inadmissible proof of one offense may be admitted for the other offense"; and
(3) Where "the defendant may wish to testify as to one count but not another."

*United States v. Ragghianti*, 527 F.2d 586, 588 (9th Cir. 1975). Defendant contends he will be prejudiced by a trial on both counts because the jury will "infer that whatever evidence supports one charge will also support the other." Dckt. 22-1 at p. 9. Specifically, Defendant posits that the government will argue both guns belonged to him, causing the evidence to work as improper "propensity" evidence to convince the jury that because he possessed one firearm, he is more likely to have possessed the other firearm.

Defendant's theory is unfounded. Prejudice does not exist when evidence would be cross-admissible in separate trials, which is the case here. *See United States v. Johnson*, 820 F.2d 1065, 1070 (9th Cir. 1987); *see also United States v. Irvine,* 756 F.2d 708, 712 (9th Cir. 1985) (denying severance where drug evidence would have been admissible in bribery trial to prove intent and ability to solicit bribe). First, the facts surrounding both counts are inextricably intertwined because law enforcement first discovered Defendant's illegal possession of the two guns when Defendant posted a video of himself holding *both* handguns. Thus, it would be illogical to sever the two counts because clear evidence exists showing Defendant possessed both guns at the same time. Further, several witnesses will testify about both counts, including to lay sufficient foundation for the admissibility of the handguns and video. Severing the counts would produce inefficiency by requiring repetition of much of the same evidence by the same witnesses in two separate trials. Finally, in light of the simplicity of the issues – whether Defendant was a felon and whether he possessed either or both guns – coupled with the Court's ability to instruct the jury, there is no reason to doubt a jury is capable of "compartmentalizing evidence of separate counts." *Johnson*, 820 F.2d at 1071. Because

17-cr-1908-BEN

the two counts are properly joined, and proceeding with both in the same trial is unlikely to manifestly prejudice Defendant, the Court denies Defendant's motion to sever.

### III.    Motion to Suppress

Defendant additionally moves to suppress evidence under the Fourth Amendment related to two particular searches. First, he moves to suppress evidence obtained during a warrantless search of the house at 423 32nd Street on April 12, 2017. Second, he moves to suppress evidence obtained during a vehicle search at the Crown Inn Motel parking lot on June 15, 2017. The Court denies the motion to suppress in its entirety.

### A.    Evidence Obtained from the House on 32nd Street on April 12, 2017

In support of his motion to suppress evidence obtained during the April 12, 2017 search, Defendant advances two independent arguments. First, law enforcement lacked probable cause to believe that 423 32nd Street was Defendant's actual residence. Second, the warrantless search was unreasonable. These arguments lack merit.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., Amdt. 4. Although a warrantless search of a residence is presumptively unreasonable, "[p]olice or parole officers may lawfully conduct searches of parolees or their residences without satisfying the Fourth Amendment's warrant requirement when certain conditions are met." *United States v. Grandberry*, 730 F.3d 968, 973 (9th Cir. 2013). "One such condition is that the parolee is subject to a provision authorizing such warrantless searches." *Id.* For example, the Supreme Court has upheld warrantless searches made pursuant to "Fourth Waivers" imposed as a condition of one's probation under California law. *United States v. Knights*, 534 U.S. 112, 121 (2001). "Before law enforcement officers may conduct a warrantless probation search, however, they must also have probable cause to believe that the probationer actually lives at the residence searched." *United States v. Mayer*, 560 F.3d 948, 957 (9th Cir. 2009).

### 1.    Probable Cause to Believe 423 32nd Street was Defendant's Residence

17-cr-1908-BEN

The Ninth Circuit applies a "relatively stringent standard in determining what constitutes probable cause that a residence belongs to a person" on probation. *United States v. Howard*, 447 F.3d 1257, 1262 (9th Cir. 2006) (overruled on other grounds). To be sure, it is not sufficient to show the probationer "may have spent the night there occasionally." *Id.* Nor is it enough that law enforcement merely observed the probationer at the residence to be searched. *United States v. Franklin*, 603 F.3d 652, 657 (9th Cir. 2010) ("That a house or apartment belonging to someone else is also the 'residence' of a probationer is not an inference that can be drawn simply because the probationer happens to be seen there."). Instead, probable cause exists only if the facts known to law enforcement at the time of the search were sufficient to support a belief in "a man of reasonable caution" that the probationer lived at the searched residence.

Here, the government established that Detective Barrera knew of Defendant's Fourth Waiver probation conditions prior to searching the residence on 32nd Street. Detective Barrera then conducted a routine computer check to determine the address identified by Defendant as his residence. The check revealed that Defendant identified 423 32nd Street as his residence consistently on nine separate occasions *to law enforcement* over the previous seven years, a factor weighing heavily in favor of probable cause. Indeed, Defendant again confirmed 423 32nd Street as his residence on February 18, 2017, a date less than two months prior to the April 12, 2017 search. Based on Defendant's own repeated confirmation of his residence, Detective Barrera conducted surveillance on 423 32nd Street. On April 12, 2017, Detective Barrera observed Defendant enter and later leave from the 32nd Street residence, accompanied by another individual. Based on his observation of Defendant at the residence coupled with Defendant's consistent identification of 423 32nd Street as his home and Defendant's identification of 423 32nd Street as his residence only two months prior, Detective Barrera believed it to be Defendant's residence and conducted a search there. Defendant has not identified any evidence known to Detective Barrera that would have somehow undermined this conclusion or cast doubt on Defendant's current residence. Thus, the

Court finds the totality of the circumstances sufficient to support a belief in a "man of reasonable caution" that Defendant still resided at the same address.

The Court rejects Defendant's reliance on *United States v. Gates*, 745 F. Supp. 2d 936 (N.D. Cal. 2010) and on *United States v. Howard*, 447 F.3d 1257 (9th Cir. 2006) (overruled in part on other grounds) as inapposite. The issue in *Gates* concerned whether probable cause existed to believe a defendant resided at an address *other than* the one he reported to law enforcement, based in part on the reliability of a confidential informant. Contrary to the facts at hand, in *Gates*, there was no evidence in the record indicating that defendant had identified the unconfirmed address as his own. *See id.* at 946. Similarly distinguishable, the issue in *Howard* concerned whether law enforcement had probable cause to believe the parolee resided at a residence *other than* the residence he reported to law enforcement. In sharp contrast to *Howard*, Detective Barrera was not attempting to determine Defendant's whereabouts or investigate some secondary address Defendant appeared to be using to hide his criminal activity. Instead, Detective Barrera went to the very address Defendant repeatedly confirmed to be his own since September 30, 2010, and observed Defendant enter and exit the address prior to conducting his search.

Regardless, applying the factors identified in *Howard* merely bolsters the Court's conclusion that probable cause existed. "The patterns *Howard* enumerated were: (1) the parolee did not appear to be residing at any address other than the one searched; (2) the officers had directly observed something that gave them good reason to suspect that the parolee was using his unreported residence as his home base; (3) the parolee had a key to the residence in question; and (4) either the parolee's co-resident or the parolee himself identified the residence in question as that of the parolee." *United States v. Grandberry*, 730 F.3d 968, 973 (9th Cir. 2013) (citing *Howard*, 447 F.3d at 1265-66).

First, law enforcement did not have any evidence suggesting Defendant resided at an address different than the one searched. Second, law enforcement directly observed Defendant enter and exit the residence he, himself, identified repeatedly as his residence. Although this observation is not a strong one standing on its own, it is an observation

11

weighing in favor of probable cause when coupled with the other information known to law enforcement. The third factor weighs slightly against a finding of probable cause: there is no evidence in the record that law enforcement observed Defendant use a key to the residence. The fourth factor is the most compelling: Defendant, himself, identified the residence in question as his own residence just two months prior to the search. Weighing these four factors, then, the Court finds probable cause existed to believe Defendant resided at 423 32nd Street, even under *Howard*.

### 2. Reasonableness of the Search

The Court next turns to whether the search of Defendant's residence was reasonable under the Fourth Amendment. "The touchstone of the Fourth Amendment is reasonableness," and thus, the Court must "evaluate the circumstances of the particular case before [it] to determine if the search was reasonable." *United States v. Lara*, 815 F.3d 605, 610 (9th Cir. 2016). Because Defendant's probation was for a nonviolent offense – petty theft – the Court is guided by the reasonableness test articulated in *Lara*, 815 F.3d 605. *See United States v. Job*, 871 F.3d 852, 860 (9th Cir. 2017). Accordingly, the Court balances "on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.*

### a. Defendant's Privacy Interest

Defendant's status as a probationer is the most important factor in the balancing test. *Lara*, 815 F.3d at 610. Although Defendant's privacy expectation is significantly diminished and "is lower than someone who has completed probation or who has never been convicted of a crime," his privacy interest is "still substantial." *Id.* Importantly, because Defendant's underlying offense is a misdemeanor for petty theft, his "reasonable expectation of privacy is greater than that of probationers such as King because [Defendant] was not convicted of a particularly 'serious and intimate' offense." *Id.* at 610 (citing *United States v. King*, 736 F.3d 805, 809 (9th Cir. 2013)).

As to the next *Lara* factor, the residence search condition of Defendant's probation was clear. The probation order expressly authorized searches of Defendant's "place of residence . . . at any time with or without a warrant." Dkt. 20-2, p. 6. Defendant was also advised of the term at his sentencing hearing, thereby "unambiguously inform[ing]" him of the condition.[2] *Knights*, 534 U.S. at 114-15.

*Lara* offers a distinguishable example of a search found *unreasonable* under a Fourth Waiver. Like Defendant, Lara's underlying offense was nonviolent, thereby entitling him to a slightly more substantial privacy interest than that of a probationer with a violent felony. Weighing heavily in favor of the defendant's privacy interest, however, was the fact that law enforcement searched Lara's cellphone and cellphone data, which was not unambiguously encompassed by the probation order search terms. Indeed, the Ninth Circuit reasoned that neither a cellphone nor cellphone data could be construed to be "property, including any residence, premises, container or vehicle under [Lara's] control." *Lara*, 815 F.3d at 611. As a result, the court concluded Lara had a substantial privacy interest in his cellphone and its data, particularly in light of the broad amount of data contained and the fact that Lara never accepted a clear, unequivocal search condition authorizing cellphone searches. The circumstances in the present case, though, are a far cry from those in *Lara*. In contrast to *Lara* where law enforcement searched cell phone data, which was clearly outside Lara's probation terms, law enforcement in the present case searched what they reasonably believed was Defendant's "residence," a search term unequivocally expressed in Defendant's probation order. Accordingly, Defendant has a privacy interest in his residence, but that privacy interest is not a substantial one in light of the clear terms of his probation.

### b. The Government's Interest

_____

[2] The Court rejects as unsupported Defendant's contention that, despite the black and white print in his probation order and Defendant's sentencing hearing, he was not "unambiguously informed" of the search condition. Dkt. 20-1, p. 13.

Turning to the other side of the balance, the government has a legitimate interest in conducting probationary searches, including interests in combatting recidivism and helping probationers integrate back into the community. *Lara*, 815 F.3d at 612. These interests' strengths "depend[s] on the degree to which the government has a specific reason to suspect that a particular probationer is reoffending or otherwise jeopardizing his reintegration into the community." *Id.* For example, the government's only reason for concern in *Lara* was the defendant's missed check-in meeting with his probationary officer. The Ninth Circuit characterized Lara's noncompliance as "worlds away from the suspected crimes that prompted the searches in *King* and *Knights.*" *Id.* In *King* and *Knights*, law enforcement had evidence or suspicion of specific crimes they suspected the defendants of committing. *See United States v. King*, 736 F.3d 805 (9th Cir. 2013) (officers suspected the defendant was involved in a homicide and knew that he had been previously convicted of the violent crime of willful infliction of corporal injury on a cohabitant); *Knights*, 534 U.S. at 112 (officers had substantial evidence showing that while on probation, Knights had vandalized and set fire to an electrical facility and an adjoining telecommunications value, causing over a million dollars in damage).

The facts in this case are more similar to *Knights* and *King* than to *Lara*, making the government's interest a weightier one in the balancing test. First, a video a mere four days prior to the search showed Defendant, a convicted felon, holding two handguns. Where the government has video evidence of a felon in possession of firearms, it is clear law enforcement had a "specific reason to suspect that a probationer is reoffending." *See Lara*, 815 F.3d at 612. Additionally, a convicted felon's brandishing of two dangerous weapons weighs in favor of the government's interest in enforcing the law and protecting the public from Defendant's recidivism. Such factors indicate a strong interest by the government.

On balance and in the circumstances of this case, the search of Defendant's residence was reasonable under the Fourth Amendment. Defendant's privacy interest was not only slightly diminished because of his status as a probationer, but it was

14

17-cr-1908-BEN

significantly diminished by his clear waiver for searches of his "residence." Considering (1) the evidence before the government suggesting Defendant had two dangerous weapons and (2) the government's interest in protecting the public, the government's interests outweigh Defendant's not insignificant privacy interest. Because probable cause existed to believe the residence searched was Defendant's residence and because the search was reasonable, Defendant's motion to suppress evidence obtained during the April 12, 2017 search is denied.

**B.  Evidence Obtained at the Crown Inn Motel Parking Lot on June 15, 2017**

In support of his motion to suppress evidence obtained on June 15, 2017, Defendant makes two primary arguments. First, the circumstances of Defendant's detention, including agents attempting to block the car in which Defendant was riding, physically removing Defendant from the vehicle, three agents drawing their weapons as they approached the vehicle, and the agents' handcuffing of Defendant, together constituted an arrest, not an investigatory stop, and his arrest was not supported by probable cause. Alternatively, Defendant contends that, even if the seizure amounted only to an investigatory stop, not an arrest, law enforcement still lacked reasonable suspicion to support the stop. Both of these arguments lack merit.

Although Defendant, as a mere passenger of the black Saturn, does not have standing to challenge the vehicle's search directly, "if the defendant c[an] establish that the initial stop of the car violated the Fourth Amendment, then the evidence that was seized as a result of that stop would be subject to suppression as 'fruit of the poisonous tree.'" *United States v. Twilley*, 222 F.3d 1092, 1095 (9th Cir. 2000) (internal citations omitted). The parties do not dispute that Defendant's detention by DEA and SDPD agents at the Crown Inn Motel on June 15, 2017 constituted a "seizure" under the Fourth Amendment because a reasonable person in Defendant's position would not have felt free "to disregard the police and go about his business." *California v. Hodari*, 499 U.S. 621, 628 (1991). The issue is, at what point Defendant's seizure transformed from a mere

17-cr-1908-BEN

"investigatory stop," requiring reasonable suspicion, to an "arrest," requiring probable cause.[3]

### 1.    Classification and Reasonableness of the Detention

There is "no bright line rule for determining whether an investigatory stop crosses the line and becomes an arrest." *United States v. Parr*, 843 F.2d 1228, 1231 (9th Cir. 1988).  Further, whether a detention by law enforcement amounts to an arrest or an investigatory stop is a fact-specific inquiry.  *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996).  This inquiry requires the Court to "evaluat[e] not only how intrusive the stop was, but also whether the methods used were reasonable *given the specific circumstances.*"  *Id.* (emphasis in original).

An officer may detain a person if he has a "particularized and objective basis for suspecting the particular person stopped of criminal activity."   *Rodriguez v. United States*, 976 F.2d 592, 594 (9th Cir. 1992), *opinion amended on denial of reh'g*.   " This objective basis, or 'reasonable suspicion' must consist of specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *Id.*  Reasonable suspicion is a very modest level of evidence: "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002).  Moreover, reasonable suspicion does not require ruling out the possibility of innocent conduct. *Id.* at 277.

---

[3] The Court rejects Defendant's brief argument that the search of the black Saturn was also unconstitutional.  As a mere passenger of the Saturn, Defendant lacks standing to challenge its search, and thus, the Court does not reach the search's constitutionality. *See, e.g., United States v. Twilley*, 222 F.3d 1092, 1095 (9th Cir. 2000) ("As a passenger, Twilley has no reasonable expectation of privacy in a car that would permit [his] Fourth Amendment challenge to a search of the car.").

In the present case, Agents De Armas, Olges, and Hedquist had reasonable suspicion sufficient to support their initial investigatory stop of Germany and Defendant in the black Saturn. A number of "specific, articulable facts" supported their reasonable suspicion. First, the agents observed and/or heard over the radio that Defendant was clutching his waist in a manner consistent with what they believed, based on training and experience, to be Defendant's effort to conceal a heavy object like a firearm. They observed and/or heard over the radio that Defendant asked agents to light a cigarette and appeared to be looking into car windows in the parking lot in a manner they believed to be counter-surveillance of the area, all just prior to an impending drug deal. In addition, only minutes before the drug deal was set to take place, Defendant appeared to engage in conversation two separate times with the target of the operation, as well as walk across the street with him, suggesting to the agents that Defendant and the target knew one another and were potentially working together. Because the agents observed and/or heard over the radio that Defendant seemed to be concealing something heavy like a firearm in his waistband, appeared to be surveilling the area just prior to a looming drug deal, and engaged twice with the drug operation's target, agents had sufficient reasonable suspicion to stop Defendant (and Germany, the driver of the car) to determine their level of involvement in the drug deal.

Defendant contends he and Germany were under arrest, rather than an investigatory stop, because they were not free to leave due to being blocked in,[4] the agents drew their weapons as they approached the vehicle, and the agents subsequently handcuffed Defendant and Germany. To be sure, these circumstances did completely infringe on Germany and Defendant's ability to leave. However, the Ninth Circuit has repeatedly rejected circumstances like these as automatically constituting an arrest. *See,*

_____

[4] Notably, the evidence shows that the agents did not block in the Saturn because Germany drove the Saturn around Agent Olges's vehicle, prompting the agents to get out and yell to them to stop their vehicle.

e.g., *United States v. Bautisa*, 684 F.2d 1286, 1289 (9th Cir. 1982) ("A brief but complete restriction of liberty, if not excessive under the circumstances," is permissible during a Terry stop and does not necessarily convert the stop into an arrest."); *Adams v. Williams*, 407 U.S. 143, 146 (1972) (finding an officer justified in drawing his weapon for self-protection and reasoning, "[T]he policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect."); *United States v. Alvarez*, 899 F.2d 833, 838-39 (9th Cir. 1990) (drawn guns did not indicate arrest where police had reason to believe suspect was armed based on tip corroborated by observation of bulge underneath suspect's jacket). Under the circumstances known to the agents at the time of the stop, including their reasonable belief that Defendant might be armed and a participant in the drug deal, they reasonably decided to draw their weapons while approaching the car, which did not convert the stop into an arrest.

Defendant cites numerous cases to support his contention that neither probable cause nor reasonable suspicion existed. For example, he emphasizes that an individual's mere presence with drug offenders is not enough. Nor is an individual's mere presence in a high crime area. Defendant's cases, however, are easily distinguishable because each of them concerned facts very different from those in the present case and concerned situations where the police justified the detention at issue by relying on only a single fact. *See, e.g., Brown v. Texas*, 443 U.S. 47, 52 (1979) (individual's mere presence in a "high crime area" standing alone, is not sufficient to establish reasonable suspicion); *United States v. Robertson*, 833 F.2d 777 (9th Cir. 1987) (no probable cause to arrest woman found on premises of home containing meth lab without more than her mere presence as a visitor). Further, the reasonable suspicion inquiry is a fact specific one and requires looking at the "totality of the circumstances" in Defendant's particular case.

Upon reaching the car, the agents' reasonable suspicion increased when Defendant not once, but twice, disobeyed the agents' orders to show them his hands. Defendant showed his hands briefly and then reached under his seat toward what appeared to be a

bottle. Again, agents ordered Defendant to show his hands, which he did, and then again, put them down, seemingly reaching for something out of the agents' line of sight around the car's floor boards. After already having appeared at the scene of a drug deal, interacted with the target of that drug deal in a way suggesting Defendant knew the target, and behaving in a way consistent with an individual concealing a firearm, the agents' level of suspicion quickly – and reasonably – elevated. At that point, the agents' removal from the vehicle and handcuffing of Defendant and Germany was reasonably necessary under the circumstances because the facts known to the agents gave them cause to believe a weapon was in the car and/or on Defendant's person. The Ninth Circuit has considered repeated attempts to reach for an object not immediately visible to be actions that can give rise to reasonable suspicion that a defendant is armed. *See, e.g., United States v. Taylor*, 716 F.2d 701, 709 (9th Cir. 1983) (handcuffing justified where suspect disobeyed orders to raise hands and made furtive movements inside the truck); *United States v. Flippin,* 924 F.2d 163, 164–66 (9th Cir. 1991) (officer reasonably suspected individual was arming self when she grabbed her makeup bag when officer turned away).

For the same reasons that the agents reasonably suspected Defendant to be "armed and presently dangerous," the agents were likewise justified in frisking Defendant for weapons. *See Thomas v. Dillard*, 818 F.3d 864, 876 (9th Cir. 2016); *see also e.g., United States v. Flatter*, 456 F.3d 1154, 1157-58 (9th Cir. 2006) ("sudden movements" suggesting a potential assault or "attempts to reach for an object that was not immediately visible"). In addition, the nature of the crime suspected is relevant because "some crimes are so frequently associated with weapons that the mere suspicion that an individual has committed them justifies a pat down search." *Flatter*, 456 F.3d at 1158; *see also, e.g., United States v. $109,179 in U.S. Currency,* 228 F.3d 1080, 1086 (9th Cir.2000) (large-scale narcotics dealing). Here, the agents suspected Defendant's involvement in a drug deal, which is a type of crime frequently associated with weapons. *See id.* For the

previous reasons, the investigatory stop of Defendant and Germany was carried out reasonably and supported by reasonable suspicion.[5]

## 2.     Admissibility Under the Attenuation Doctrine

In the alternative, even if the stop was unlawful, the evidence is still admissible under the attenuation doctrine and *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016). "Evidence is admissible when the connection between the unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest protected by the constitutional guarantee that has been violated would be served by suppression of the evidence obtained." *Id.* *Strieff* is analogous to the facts at hand. In *Strieff*, officers observed the defendant exiting a house where they believed individuals were conducting narcotics sales. *Id.* at 2060. One of the officers stopped the defendant outside of a store located near the house and learned Defendant had a valid warrant out for his arrest. *Id.* The officer searched the defendant and found drugs and drug paraphernalia. The defendant moved to suppress the evidence, arguing the officer's investigatory stop was not supported by reasonable suspicion.

The Supreme Court evaluated three factors to determine whether evidence should be suppressed under the exclusionary rule. *Id.* at 2062. First, the Court considered the temporal proximity between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. *Id.* Second, the Court considered the presence of intervening circumstances. *Id.* And third, "and 'particularly significant," the Court examined "the purpose and flagrancy of the official misconduct." *Id.* (internal citations omitted). The Court found the first factor weighed in favor of suppression, but the second and third factors weighed in favor of

---

[5] The stop transformed into an arrest once the agents determined Defendant had a stolen gun in his possession and a warrant out for his arrest, all of which constituted sufficient probable cause. Defendant does not challenge the constitutionality of his arrest at this point in time.

17-cr-1908-BEN

admitting the evidence.  Specifically, the Court reasoned that the arrest warrant pre-existed and was entirely unrelated to the stop, which was ministerial.  Further, the arrest warrant authorized the officer's lawful search incident to the arrest on the warrant.  Finally, as to the third factor, the Court found the officer's actions to be at most "negligent" and not the type of flagrant misconduct the exclusionary rule is designed to deter.

Similarly, in this case, the temporal proximity factor is the only factor weighing in favor of excluding the evidence.  Like in *Strieff*, the warrants out for Defendant's arrest pre-existed and were entirely independent of the agents' investigation and drug buy-bust operation.  There is no evidence suggesting the agents acted with purposeful or flagrant disregard for Defendant's constitutional rights.  Instead, assuming they lacked reasonable suspicion, they were negligent at most.  Accordingly, even if the seizure was unconstitutional, the motion to suppress evidence from June 15, 2017 must be denied on this ground, as well.

## IV.    CONCLUSION

For all of the foregoing reasons, Defendant's motions to sever and to suppress (Dkt. 20, 22) evidence are **DENIED**.

**IT IS SO ORDERED.**

DATED: September 24, 2018

_____
HON. ROGER T. BENITEZ
United States District Judge

17-cr-1908-BEN